UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


John Wallace et al.

    v.                                          Civil No.  18-cv-747-LM
                                            Opinion No. 2019 DNH 113
Nautilus Insurance Company



**O R D E R**

John Wallace and Elizabeth Trase ("plaintiffs") hired
McPhail Roofing, LLC ("McPhail") to replace the roofs on both of
their houses.  Shortly after McPhail finished construction,
plaintiffs noticed that the roofs were leaking, and eventually
replaced the roofs.  Plaintiffs subsequently commenced an
arbitration proceeding against McPhail, and were awarded the
cost of replacing the roofs, compensation for the damage done to
their property by the leaking, and attorneys' fees and expenses.

Nautilus Insurance Company ("Nautilus"), McPhail's
commercial general liability insurer, defended McPhail in the
arbitration.  Nautilus paid plaintiffs on McPhail's behalf
roughly 10% of the arbitrator's award, which included
compensation for the damage to plaintiffs' houses and property
caused by the leaking, such as landscaping damages, repainting,
and attic cleaning and reinsulation.  In addition, Nautilus paid
expenses and fees plaintiffs incurred in pursuing the

arbitration, including expert witness fees and pre- and post-judgment interest. Nautilus asserted, however, that its insurance policy with McPhail did not cover the cost of replacing the roofs or plaintiffs' attorneys' fees, and it refused to indemnify McPhail for those amounts.

After McPhail declared bankruptcy, plaintiffs brought this action against Nautilus, seeking a declaration that the unpaid portion of the arbitrator's award is covered by McPhail's insurance policy with Nautilus. See N.H. Rev. Stat. Ann. ("RSA") 491:22.

The court granted the parties' joint request to resolve this case on a stipulated record. The parties have submitted cross-motions for judgment on the stipulated record and, on May 16, 2019, the court heard oral argument.[1]

At the May 16 hearing, Nautilus requested the opportunity to file a supplemental memorandum addressing issues the court raised during oral argument. The court granted that request and the parties submitted supplemental memoranda. See doc. nos. 22 & 23. The court has considered the memoranda in resolving the parties' motions.

_____

[1] The parties filed briefs in support of their respective positions, rather than motions for judgment on the stipulated record. See doc. nos. 14 & 16. For the sake of clarity, the court construes the parties' briefs as cross-motions for judgment on the stipulated record.

## BACKGROUND

Plaintiffs own adjoining houses on Quarry Road in Yarmouth, Maine. In 2015, plaintiffs determined that the cedar shingle roofing on both their houses was deteriorating. In September 2015, plaintiffs entered into separate contracts with McPhail to replace the roofs on their houses. Both contracts called for McPhail to install "LifePine" roofs.

McPhail used subcontractors to complete the work and finished the roof replacements in the fall of 2015. In November 2015, after McPhail installed the roofs, both plaintiffs noticed several issues with their roofs, both aesthetically and otherwise.[2] The plaintiffs withheld roughly a third of the agreed-upon contract price from the final payments due to McPhail under the contracts.

Plaintiffs contacted LifePine's owner, who referred them to Robert Fulmer, a roofing consultant in New Hampshire who the owner described as an expert in LifePine roofs. In January 2016, Fulmer conducted a detailed inspection of the roofs and found evidence of water leaking through both roofs during rainstorms. According to Fulmer, improper installation of the

---

[2] For example, although not detailed in the parties' motions, the stipulated record shows that plaintiffs noticed issues with the "ridge cap installation" that did "not appear to allow proper ventilation" and a two-inch "reveal" in one course of the "shakes" at Wallace's house. Doc. no. 14-1 at 2.

shakes on the roofs allowed rain to seep through to the roof decks (the plywood underneath the roofs) and eventually into the houses. Fulmer opined that the only way to cure the installation defects was to remove and replace the roofs entirely. Plaintiffs took Fulmer's advice and replaced both roofs, using another contractor.

Plaintiffs and McPhail were unable to resolve their dispute and proceeded to arbitration. Plaintiffs sought compensation for the damage caused by the leaking and for the replacement cost of the roofs. McPhail sought the remaining payment due under the parties' contracts. Nautilus, with whom McPhail held a general commercial liability policy (the "Policy"), defended McPhail in the proceeding.

On June 29, 2017, the arbitrator issued an award, finding that McPhail had failed to properly install the roofs in accordance with the manufacturer's instructions and applicable building codes. He further found that the remedy of removing and replacing the roofs was reasonable.

The arbitrator awarded Wallace $140,053.50 and Trase $160,065.62 against McPhail. At the parties' request, the arbitrator itemized the award of damages for each plaintiff. For Wallace, the arbitrator awarded damages for the replacement roof without shingles, the shingles themselves, attic cleaning,

4

attic reinsulation, and repainting.  For Trase, the arbitrator awarded damages for the replacement roof without shingles, the shingles themselves, and damage to her landscaping.

In addition, the parties stipulated that the arbitrator must award attorneys' fees and expenses to the substantially prevailing party.  Because the parties could not agree on the amounts, the arbitrator issued a Supplemental Decision on March 29, 2018.  He awarded plaintiffs $176,898.95, broken down separately into awards for attorneys' fees, expert witness fees, and other expenses, plus additional compensation for pre- and post-judgment interest.  On May 10, 2018, the District of Maine entered a judgment confirming the arbitration awards against McPhail.  <u>Wallace & Trase v. Notinger as Ch. 7 Bankr. Trustee for McPhail Roofing, LLC</u>, No. 2:18-cv-00188, Dkt. No. 4 (D. Me. May 10, 2018).

Nautilus promptly paid plaintiffs on McPhail's behalf what it determined was covered under the Policy.  Specifically, Nautilus paid Wallace $14,961.70, which represented the itemized damages in the arbitrator's award for attic cleaning and reinsulation, as well as repainting, and $25,910.24 in expert witness fees and expenses.  Nautilus paid Trase $873.63, which represented the itemized damages to her landscaping, and $24,566.32 in expert witness fees and expenses.  Nautilus

refused to pay the remainder of the arbitrator's award, including the cost of replacing the roofs and the award of attorneys' fees.

Following McPhail's declaration of bankruptcy, plaintiffs obtained an assignment of McPhail's claims against Nautilus. In re McPhail Roofing, LLC, No. 17-11305-MAF, Dkt. No. 99 (Bankr. D.N.H. Aug. 22, 2018). This action followed.

## STANDARD OF REVIEW

Under New Hampshire law,[3] in "'a declaratory judgment action to determine the coverage of an insurance policy, the burden of proof is always on the insurer, regardless of which party brings the petition.'" Mass. Bay Ins. Co. v. Am. Healthcare Servs. Ass'n, 170 N.H. 342, 348 (2017) (quoting Cogswell Farm Condo. Ass'n v. Tower Grp., Inc., 167 N.H. 245, 248 (2015)); see RSA 491:22-a (2010). "The interpretation of insurance policy language is a question of law for this court to decide."

---

[3] The parties agree that New Hampshire law applies to their dispute because New Hampshire bears the most significant relationship to the Policy, as McPhail is a New Hampshire company and Nautilus and McPhail entered into the agreement in the state. See Consol. Mut. Ins. Co. v. Radio Foods Corp., 108 N.H. 494, 496 (1968) (holding that "in the absence of an express choice of law validly made by the parties, the contract is to be governed, both as to validity and performance, by the law of the State with which the contract has its most significant relationship").

<u>Cogswell Farm</u>, 167 N.H. at 248 (quotation omitted).  The court

first looks "to the plain and ordinary meaning of the policy's

words in context, and . . . construe[s] the terms of the policy

as would a reasonable person in the position of the insured

based on more than a casual reading of the policy as a whole."

<u>Id.</u> (quotation omitted).  "If more than one reasonable

interpretation is possible, and an interpretation provides

coverage, the policy contains an ambiguity and will be construed

against the insurer."  <u>Id.</u>


**DISCUSSION**

The parties' dispute requires the court to answer two

questions:  First, does the Policy require Nautilus to indemnify

McPhail, and therefore provide payment to plaintiffs, for the

cost of removing and replacing plaintiffs' roofs?  Second, does

the Policy require Nautilus to pay plaintiffs' attorneys' fees

incurred in the arbitration?  The court addresses each question

in turn.


I.   <u>Coverage for Cost of Replacement Roofs</u>

Nautilus contends that it does not have a duty to indemnify

McPhail for the cost of removing and replacing plaintiffs' roofs

for two reasons.  It argues: 1) the loss is outside the scope of

the Policy's coverage; and 2) even if some portion of the loss is within the Policy's coverage, the loss is excluded by one or more Policy exclusions.  Plaintiffs dispute both arguments.

A.  Scope of Coverage

The Policy at issue in this case is a standard commercial general liability ("CGL") policy, the language of which has been subject to litigation in several jurisdictions for many years. Under the Policy, Nautilus agreed to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."  Doc. no. 14-3 at 11.  The Policy applies only if the "'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory.'"  Id. Finally, the Policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  Id. at 24.

1.  Occurrence

Nautilus contends that under New Hampshire law, the cost to replace defective workmanship—here, the roofs themselves—is not covered under the Policy because defective workmanship is not an occurrence.  In support of its position, Nautilus relies

primarily on Weedo v. Stone-E-Brick, Inc., 81 N.J. 233 (1979), a New Jersey Supreme Court case which has been cited often in various jurisdictions. Weedo holds that a standard CGL policy does not cover the cost to make good on faulty workmanship absent property damage or bodily injury. Although, as Nautilus concedes, Weedo has never been cited by a New Hampshire state court, New Hampshire law is consistent with its holding. See Hull v. Berkshire Mut. Ins. Co., 121 N.H. 230, 231 (1981) (holding that plaintiffs' claim was not covered by a standard CGL policy because "they allege no bodily injury or property damage . . . [or] damages caused by an accident" and instead had alleged only "a claim for money damages for the builder's defective work"); see also McAllister v. Peerless Ins. Co., 124 N.H. 676, 678 (1984) (holding that "defective work, standing alone, did not result from an occurrence, and indeed was not property damaged within the meaning of the policy").

Plaintiffs do not dispute that New Hampshire law holds that defective workmanship alone is not an occurrence under the Policy's language. They argue, however, that the occurrence for purposes of the Policy in this case is not the defective workmanship itself, but rather the leaking caused by the defective roofs, which resulted in property damage. The court agrees.

In High Country Assocs. v. N.H. Ins. Co., 139 N.H. 39 (1994), the New Hampshire Supreme Court addressed the issue of what constitutes an "occurrence" for purposes of a standard CGL policy. The plaintiffs brought an underlying suit against a construction company that had built several condominium units. The plaintiffs alleged that the company's negligent construction "resulted in substantial moisture seepage into the buildings, causing mildew and rotting of the walls, and loss of structural integrity." Id. at 41. The construction company held a standard CGL policy with the defendant insurer, and the plaintiffs brought a declaratory judgment action against the insurer seeking indemnification under the policy. The superior court granted the insurer's motion for summary judgment, holding that the allegations of damage in the underlying suit did not constitute an occurrence as defined in the CGL policy.

The New Hampshire Supreme Court reversed, holding that the plaintiffs had alleged an occurrence: the "actual damage to the buildings caused by exposure to water seeping into the walls that resulted from the negligent construction methods of High Country Associates." Id. at 43. The court added:

> the property damage described in the amended writ, caused by continuous exposure to moisture through leaky walls, is not simply a claim for the contractor's defective work. Instead, the plaintiff in the underlying suit alleged negligent construction

10

that resulted in property damage, rather than merely negligent construction as in <u>Hull</u> and <u>McAllister</u>.

<u>Id.</u>

As in <u>High Country</u>, there was an occurrence here——water leaking through the poorly constructed roofs.  Indeed, prior to this lawsuit, Nautilus recognized that there was an occurrence, because it agreed that the damage to Wallace's attic and Trase's landscaping was covered under the Policy and compensated plaintiffs accordingly.  Thus, despite Nautilus' assertion to the contrary, as in <u>High Country</u>, this case deals with "negligent construction that resulted in an occurrence, rather than an occurrence of alleged negligent construction."  <u>Id.</u> at 45.


## 2.  Damages because of property damage

The fact that there was an occurrence that caused property damage, however, does not end the court's inquiry.  The Policy provides that Nautilus is obligated to pay the "sums that the insured becomes legally obligated to pay as damages <u>because of</u> 'bodily injury' or 'property damage' to which this insurance applies."  Doc. no. 14-3 at 11 (emphasis added).  Thus, the relevant question is whether the cost of removing and replacing the roofs is considered damages because of plaintiffs' property damage.

Nautilus argues that this cost is not damages because of property damage under the Policy. It relies generally on cases that provide that the cost of repairing and replacing faulty workmanship is not compensable under a standard CGL policy, and notes that plaintiffs offer no case law that supports their broad interpretation of the Policy's language.

In response, plaintiffs offer two arguments in favor of coverage. First, they assert that in both houses, the roof decks—the sheets of plywood underneath the roofs themselves—were damaged by the water leaking from the inadequately constructed roofs. They contend that the roof decks are property and that, therefore, damage to the roof decks constitutes property damage caused by an occurrence. Plaintiffs further argue that the physical damage to the roof decks could not be repaired without removing the roofs and that, as such, the cost of removing and replacing the roofs is covered under the Policy.[4] Second, they contend that the damages for the roof replacement costs are "causally linked" to the leaking and are therefore damages incurred "because of" property damage under the Policy.

---

[4] Such damages—the cost of removing and replacing undamaged property in order to replace damaged property—are often referred to as "rip-and-tear" damages.

a.    <u>Rip-and-tear damages</u>

The arbitrator found that plaintiffs' houses had experienced water infiltration caused by McPhail's failure to install the roofs as required by LifePine's Roofing Installation Instructions and that the installation failed to comply with applicable building codes.  He further found that because of these defects, there was water intrusion in Wallace's attic and the roof decks on both houses, and damage to Trase's landscaping.

Plaintiffs assert that because the roof decks, which constitute their property, are directly underneath the roofs, the physical damage to the roof decks could not be repaired without removing the roofs themselves.  They contend that as such, they are entitled to recover the cost of removing and replacing the roofs.

No New Hampshire case has addressed the question of whether so-called "rip-and-tear" damages are covered under a standard CGL policy.  Case law from other jurisdictions, however, supports the principle that such damages fall within the scope of coverage of such policies.  See <u>Carithers v. Mid-Continent Cas. Co.</u>, 782 F.3d 1240, 1251 (11th Cir. 2015) (affirming district court's holding that cost of replacing a defectively-constructed balcony was covered under standard CGL policy when

it was necessary to remove the balcony to repair property damage to the plaintiff's garage); Clear, LLC v. Am. & Foreign Ins. Co., No. 3:07CV00110JWS, 2008 WL 818978, at *9 (D. Alaska Mar. 24, 2008) (interpreting standard CGL policy to provide coverage for "the reasonable costs to repair property damage caused by the defective work . . ., including the cost of removing and replacing property that was not injured when that removal and replacement was necessary in order to fix the damage caused by" the defective workmanship).  Nautilus did not address plaintiffs' argument concerning rip-and-tear damages in its filings.

During oral argument, however, in response to the court's questioning, Nautilus' counsel stated that although the roof decks on both houses were stained by the leaking from the defective roofs, they did not need to be repaired or replaced.[5] Nautilus' counsel represented that the roof decks on both houses were re-used when the replacement roofs were constructed. Nautilus' counsel invited plaintiffs' counsel to correct him if he misspoke; plaintiffs' counsel did not do so.  During the

_____

[5] Although the Trase house had a full roof deck, the Wallace house apparently used only pieces of a roof deck which were attached to purlins, and otherwise did not use a roof deck.  The difference in construction between the two houses is not material to the court's analysis.

14

arbitration, several witnesses testified, consistent with Nautilus' counsel's representations during oral argument, that the roof decks were reused when plaintiffs replaced McPhail's roofs.  See Stip. Rec. at R-3.92-93 (Wallace testimony); id. at R-3.220-22 (Sean Urqhardt testimony);[6] id. at R-4.98-99 & 4.251 (Robert Fulmer testimony).

Thus, even assuming that rip-and-tear damages are covered under the Policy, plaintiffs did not incur such damages in this case.  The stipulated record shows that contrary to plaintiffs' representation in their motion, the roofs did not need to be removed to "replace the water-damaged roof deck below."  Doc. no. 16 at 10.  The roof decks were not replaced but were instead re-used when plaintiffs replaced McPhail's roofs.  For these reasons, plaintiffs' arguments concerning "rip-and-tear" damages are not applicable to the facts of this case.

    b.  Causal link

In response to Nautilus' argument that repairing or replacing defective workmanship does not fall within the scope of the Policy's coverage, plaintiffs argue that the damages for roof replacement costs are "causally linked" to the property damage caused by the occurrence.  In support, plaintiffs assert

---

    [6] Sean Urqhardt is the caretaker for plaintiffs' property.

that in his decision, the arbitrator had to decide whether the extent of the leaking and resulting damage justified the full replacement cost of the roofs. They argue:

> The very first point the Arbitrator made in deciding that issue was that there had been leaking that caused property damage, making clear that the existence of property damage from leaking was an important factor in deciding to award the full replacement cost. (Id.) One could easily imagine, in fact, that the Arbitrator would have determined that a different remedy was appropriate had there been the same defective work but no damage from leaking. See, e.g., Restatement (Second) of Contracts § 348 (1981) ("If an award based on the cost to remedy the defects would clearly be excessive . . . damages will be based instead on the difference between the market price that the property would have had without the defects and the market price of the property with the defects."). Because the Arbitrator's own analysis demonstrates that the property damage from leaking was an important factor in awarding the damages at issue, the damages are "causally linked" to the property damage.

Doc. no. 16 at 12.

Plaintiffs' argument mischaracterizes the arbitrator's decision. Nowhere in his decision does the arbitrator suggest that the damage to plaintiffs' property was the basis for, or even a factor in, his determination that plaintiffs are entitled to recover the cost of the roof replacements from McPhail. Rather, in awarding plaintiffs the cost of replacing the roofs, the arbitrator stated:

> I focus on the situation the Owners faced. When Bolen became involved, he referred the Owners to Fulmer as an expert who [sic] he hoped could mediate between the Owners and McPhail. Fulmer advised the Owners that

> the only way to cure the installation defects was to
> remove and replace the roofs.  There is no dispute
> that interlayment could not be retrofitted into the
> roofs; in order to fulfill the installation
> instruction and code requirement of interlayment, the
> roofs had to be replaced.  Faced with a recommendation
> made by the expert referred by the manufacturer, it
> was reasonable for the Owners to rely on that advice
> in choosing the remedy.

Doc. no. 14-1 at 8.  Thus, the arbitrator found that plaintiffs

were entitled to the replacement cost of the roofs because: (1)

the roofs were installed defectively; and (2) plaintiffs'

consultant advised them that the only way to cure the

installation defects was to remove and replace the roofs.  The

arbitrator's reasoning is not dependent on or influenced by

damage to plaintiffs' property.

In their motion, plaintiffs rely on M. Mooney Corp. v. U.S.

Fid. & Guar. Co., 136 N.H. 463, 466 (1992) to support their

broad interpretation of the Policy's language as to the "causal

link" necessary to trigger the Policy's coverage.  In Mooney,

the plaintiff hired a contractor to build 52 condominium units.

After the units were completed and sold, a chimney fire damaged

one unit.  Inspection of the other units showed charring

adjacent to fireplaces in four other units.

The fire marshal investigated the fire and determined that

the contractor had improperly constructed the fireplaces.  He

ordered that no fireplaces could be used until the defects were repaired and the fire hazard eliminated.

The contractor held a standard CGL policy with the defendant.  The defendant agreed that the policy covered the cost of repairing the five damaged units but denied coverage for the other forty-seven units that were repaired by order of the fire marshal.  The New Hampshire Supreme Court held that the loss of use of the fireplaces in the other forty-seven units was considered "property damage" under the policy.

Mooney is not applicable to the facts of this case.  In Mooney, "loss of use" was defined as "property damage" in the policy.  Therefore, the plaintiff's loss of use of the forty-seven fireplaces and the units themselves was specifically considered "property damage" under the policy.  As such, the plaintiff's loss of use of the fireplaces and the units was, by definition, covered under the policy.  Here, however, plaintiffs make no claim that the cost of replacing their roofs is itself property damage or that any specific Policy provision covers that cost.  Thus, plaintiffs' reliance on Mooney is misplaced.

In their supplemental memorandum, plaintiffs offer several cases that purportedly support their theory that a standard CGL policy covers the cost of repairing defective work merely because the work resulted in an occurrence that caused property

damage.  See doc. no. 23 at 4.  None of the cases plaintiffs
offer, however, stands for the proposition that a CGL policy
covers the cost of replacing defective work any time property
damage results from it.  Instead, at best, the cases plaintiffs
cite stand for the proposition that when a contractor's
defective workmanship leads to property damage caused by an
occurrence that also damages the defective work itself, the cost
of repairing that work may be considered property damage covered
under a standard CGL policy.  See Crownover v. Mid-Continent
Cas. Co., 772 F.3d 197, 206-07 (5th Cir. 2014) (holding that
standard CGL policy covered cost of replacing HVAC units
defectively installed because the defective installation caused
"property damage" to the HVAC units themselves); Forrest Const.,
Inc. v. Cinc. Ins. Co., 703 F.3d 359, 365-66 (6th Cir. 2013)
(holding that subcontractor's negligent construction that caused
damage to property and the construction project itself was
covered under CGL policy); Limbach Co. LLC v. Zurich Am. Ins.
Co., 396 F.3d 358, 363 (4th Cir. 2005) (holding that standard
CGL policy covered cost of repairing "property damage" to
subcontractor's work damaged by contractor's defective
workmanship); Auto-Owners Ins. Co. v. Pozzi Window Co., 984 So.
2d 1241, 1248-49 (Fla. 2008) (holding that where windows in home
constructed by the defendant were damaged by defective

installation, damage to the windows was considered property
damage and covered by a CGL policy); Lamar Houses, Inc. v. Mid-
Continent Cas. Co., 242 S.W.3d 1, 10 (Tex. 2007) (holding that
construction defects in house that damaged the house itself
constituted "property damage" sufficient to trigger the duty to
defend or indemnify under a CGL policy); Am. Family Mut. Ins.
Co. v. Am. Girl, Inc., 673 N.W.2d 65, 75-78 (Wis. 2004) (holding
that damage to warehouse constructed by contractor caused by the
contractor's improper soil preparation constituted "property
damage" caused by an occurrence under standard CGL policy);
Corner Const. Co. v. U.S. Fid. & Guar. Co., 638 N.W.2d 887, 895
(S.D. 2002) (holding that subcontractor's defective insulation
work that caused damage to general contractor's work was
property damage covered by CGL policy).

     Even if that property damage principle were consistent with
New Hampshire case law, it is not applicable to the
circumstances presented in this case.  The arbitrator's decision
makes clear that because of the leaking, "there was some water
intrusion in [Wallace's] attic and in the area near the French
doors in [Trase's] house.  It is also clear that water was
getting through the three layers of shakes to the roof deck,
something that would not have occurred had there been
interlayment."  Doc. no. 14-1 at 8.  Plaintiffs do not argue,

and the arbitrator did not find, that the leaking from the defective roofs caused damage to the roofs themselves.

No New Hampshire case stands for the proposition that plaintiffs argue for here: that a CGL policy covers the cost of replacing defective work any time property damage results from it. Nautilus' argument, that such a principle is inconsistent with New Hampshire law, is persuasive. Therefore, the damages for the cost of replacing plaintiffs' roofs are not covered by the Policy.

### B.   Exclusions

Because the court has determined that the damages for the cost of replacing plaintiffs' roofs falls outside the scope of the Policy's coverage, the court does not address the parties' arguments as to whether any exclusions apply.

## II.  Attorneys' Fees

During the arbitration hearing, the parties stipulated "that the substantially prevailing party in this action must be awarded attorney's fees in an amount to be determined by the arbitrator, together with expenses." Doc. no. 14-2 at 3. After the arbitrator ruled in plaintiffs' favor as to McPhail's liability, plaintiffs submitted legal bills and documentation to

the arbitrator to support their request for fees and expenses.
McPhail objected.

In a supplemental decision, the arbitrator awarded
plaintiffs $176,898.85 in attorneys' fees and expenses, breaking
down the award as follows: $127,933 in attorneys' fees;
$44,328.46 in expert witness expenses; and $4,637.49 in other
expenses. Nautilus paid plaintiffs amounts awarded for expert
witness and other expenses, as well as pre- and post-judgment
interest. It asserted, however, that the award of attorneys'
fees was not covered by the Policy and refused to pay that
amount on McPhail's behalf. Plaintiffs now seek a declaration
that the arbitrator's attorneys' fees award is covered by the
Policy.

Nautilus, which bears the burden of showing that coverage
does not exist, makes two arguments. First, it refers to the
Policy's "Supplementary Payments" provision, which provides that
Nautilus is obligated to pay all "costs taxed against the
insured" in any suit that Nautilus defends, as well as any pre-
and post-judgment interest. The Supplementary Payments
provision, however, does not mention attorneys' fees. Nautilus
contends that, therefore, it is not obligated to pay such fees
on McPhail's behalf. Second, Nautilus argues that attorneys'

fees cannot be considered "damages because of property damage" as that phrase is interpreted under New Hampshire law.

Plaintiffs concede that the Supplementary Payments provision does not reference attorneys' fees. They argue, however, that the court should interpret the phrase "costs taxed against the insured" to include attorneys' fees. They also argue that attorneys' fees should be considered damages under the Policy.

A.    Attorneys' Fees as "Costs Taxed Against the Insured"

The Policy's "Supplementary Payments" provision provides in relevant part:

> 1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:
>
> . . .
>
> e. All costs taxed against the insured in the "suit."[7]
>
> f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.
>
> g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the

---

[7] Nautilus does not dispute that the arbitration is considered a "suit" for purposes of the Supplementary Payments provision.

part of the judgment that is within the applicable
limit of insurance.

Doc. no. 14-3 at 17-18.  Plaintiffs urge the court to interpret
the phrase "costs taxed against the insured" to include
attorneys' fees.

As plaintiffs concede, the Policy does not define "costs
taxed" in the Supplementary Payments provision or elsewhere.
Plaintiffs also correctly state that no courts applying New
Hampshire law have construed the phrase "costs taxed" in the
insurance policy context.  Plaintiffs contend that "costs taxed"
as used in the Policy is ambiguous and, therefore, under New
Hampshire law, should be construed against Nautilus to encompass
attorneys' fees.  The court agrees.

Although no court has construed the phrase "costs taxed" in
the insurance policy context under New Hampshire law, several
courts have interpreted the phrase under other state law to
include an award of attorneys' fees.  See Ferrell v. W. Bend
Mut. Ins. Co., 393 F.3d 786, 796 (8th Cir. 2005) (holding that
under Arkansas law, an attorneys' fee award in an underlying
dispute "was part of the 'costs' taxed against the insured");
R.W. Beck & Assocs. v. City & Borough of Sitka, 27 F.3d 1475,
1484 n.13 (9th Cir. 1994) (noting that under Alaska law,
"insurance policy provision providing for payment of 'costs
taxed against the insured' covered attorneys' fees"); St. Paul

24

Fire & Marine Ins. Co. v. Hebert Const., Inc., 450 F. Supp. 2d
1214, 1234-35 (W.D. Wash. 2006) (The "Court concludes that the
'costs taxed' provision includes the attorneys' fees made a part
of the judgment in the state-court action . . . . the plain,
ordinary meaning of the 'costs taxed' clause in the [insurance]
policies includes attorneys' fees."); see also Hunters Ridge
Condo. Ass'n v. Sherwood Crossing, LLC, 395 P.3d 892, 905 (Or.
2017) (noting that under Oregon law, the term "costs" as used in
an insurance policy is ambiguous and should be construed against
the drafter to include attorneys' fees); Mid-Continent Cas. Co.
v. Treace, 186 So. 3d 11, 12 (Fla. Dist. Ct. App. 2015) (holding
that identical language in a CGL policy included attorneys' fees
under Florida law); Emp'rs Mut. Cas. Co. v. Donnelly, 154 Idaho
499, 503 (Idaho 2013) (interpreting Idaho law and holding that
"[a]ll costs taxed against the insured" includes attorneys'
fees); Ins. Co. of N. Am. v. Nat'l Am. Ins. Co., 37 Cal. App.
4th 195, 206-07 (Cal. 1995) (holding that attorneys' fees are
costs taxed against an insured in standard Supplementary
Payments provision of an insurance contract under California
law); but see CIM Ins. Corp. v. Masamitsu, 74 F. Supp. 2d 975,
993 (D. Haw. 1999) (holding that interpreting the phrase "costs
taxed against the insured" to exclude attorneys' fees is
consistent with Hawaii law).

Nautilus does not directly address plaintiffs' argument as
to the interpretation of "costs taxed against the insured."
Instead it argues simply, and without offering case law to
support its position, that "[g]iven that the policy does provide
for payments of costs, pre-judgment interest, and post-judgment
interest, the omission of a similar provision for attorneys'
fees demonstrates that attorneys' fees are not compensable as a
supplementary payment." Doc. no. 14 at 18. The court
disagrees.

Nautilus' argument misses the obvious point: there is an
ambiguity as to whether attorneys' fees are compensable as
"costs taxed against the insured" under the Supplementary
Payments provision. Thus, to draw an inference in Nautilus'
favor from the absence of the reference to attorneys' fees would
be contrary to New Hampshire law, which construes ambiguities
against the insurer. See, e.g., Cogswell Farm, 167 N.H. at 248
("If more than one reasonable interpretation is possible, and an
interpretation provides coverage, the policy contains an
ambiguity and will be construed against the insurer."). As the
Seventh Circuit aptly stated when interpreting a CGL policy
under Illinois law,

> If an insurer does not wish to underwrite attorney's
> fees charged against its insureds, it need only add
> words of exclusion to its contracts. Here, the four
> words "exclusive of attorney's fees", inserted into

26

the policy after the word "costs", would have
accomplished State Farm's goal.  In the absence of
this qualification, the district court correctly
decided that the insurance policy's coverage of costs
included attorney's fees.

Littlefield v. McGuffey, 979 F.2d 101, 105 (7th Cir. 1992).

Indeed, the standard CGL policy was subsequently amended to make that very distinction.  Section 1.e. of the Supplementary Payments section now reads that the insurer will pay with respect to any "suit" against an insured it defends: "All court costs taxed against the insured in the 'suit.' However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured."  ISO Properties, CGL Form CG 00 01 12 07, at 8 (2007).[8]  The addition of this sentence only highlights the ambiguity in the phrase "costs taxed against the insured" in the Policy at issue in this case.  See, e.g., Pan American v. Aetna, 505 F.2d 989, 1001 n.10 (2d Cir. 1974) (holding that a subsequent change in an insurance contract to language which is asserted to be ambiguous is evidence of that ambiguity).

For these reasons, the court construes "costs taxed against the insured" in the Supplementary Payments provision of the Policy to include attorneys' fees.  Therefore, Nautilus is

---

[8] Available at http://www.tmsic.com/pdfs/CommercialGeneralLiabilityCoverageForm_OccurrenceBasis.pdf.

obligated to pay plaintiffs the attorneys' fees assessed in the arbitrator's decision on McPhail's behalf.

### B.   Attorneys' Fees as Damages

Because the court holds that the Policy obligates Nautilus to pay plaintiffs' attorneys' fees as awarded by the arbitrator on McPhail's behalf, the court does not address the parties' arguments as to whether attorneys' fees are also compensable as damages under the Policy.

### C.   Additional Attorneys' Fees

RSA 491:22-b provides as follows: "In any action to determine coverage of any insurance policy pursuant to RSA 491:22, if the insured prevails in such an action, he shall receive court costs and reasonable attorneys' fees from the insurer."  In their complaint and in their motion, plaintiffs request attorneys' fees and costs incurred in this action pursuant to the statute.

The court has determined that plaintiffs are not entitled to coverage under the Policy for the cost of replacing their roofs.  They are, however, entitled to reasonable attorneys' fees incurred in the arbitration under the Policy.

Whether plaintiffs are prevailing parties under RSA 491:22 is not readily apparent from New Hampshire case law and has not been briefed by the parties. Because a declaratory judgment action under RSA 491:22-b is a "broad remedy which should be liberally construed," Gen. Linen Serv. Co. v. Charter Oak Fire Ins. Co., 951 F. Supp. 15, 17 (D.N.H. 1995) (internal citations and quotation marks omitted), the court is inclined to grant plaintiffs their costs and reasonable attorneys' fees incurred in this action.

In fairness to Nautilus, however, the court will hold in abeyance its ruling as to this issue to allow the parties to confer to attempt to reach an agreement as to whether plaintiffs are entitled to costs and attorneys' fees incurred in connection with bringing this action and, if so, the appropriate award of such costs and attorneys' fees. As provided further below, the parties shall notify the court as to whether they have reached an agreement within 21 days of the date of this order. If agreement is not reached, the parties are granted an opportunity to brief the issue. Plaintiffs' brief shall address whether the court's ruling in this order entitles them to costs and reasonable attorneys' fees under RSA 491:22-b and, if so, the amount of costs and attorneys' fees they request along with

supporting documentation, and Nautilus shall then file a response.

**CONCLUSION**

For the foregoing reasons, Nautilus' motion for judgment on the stipulated record (doc. no. 14) is granted to the extent it seeks a declaration that Nautilus has no duty to indemnify McPhail for the costs of replacement roofs and the cost of shingles, but denied to the extent it seeks a declaration that it has no duty to indemnify McPhail for attorneys' fees awarded to plaintiffs in the arbitration.  Plaintiffs' motion for judgment on the stipulated record (doc. no. 16) is granted to the extent it seeks a declaration that Nautilus has a duty to indemnify McPhail for attorneys' fees awarded to plaintiffs in the arbitration, but denied to the extent it seeks a declaration that Nautilus has a duty to indemnify McPhail for the costs of replacement roofs and the cost of shingles.

The court holds in abeyance its ruling as to whether plaintiffs are entitled to costs and reasonable attorneys' fees incurred in bringing this suit under RSA 491:22-b.  The parties shall notify the court as to whether they have reached an agreement as to costs and fees within 21 days of the date of this order.  If the parties cannot reach an agreement,

plaintiffs shall file a brief in support of their request within 14 days of the day notification is provided to the court. Nautilus shall then have 14 days to file a response.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

July 23, 2019

cc:  Counsel of Record